IRVING, J.,
 

 for the Court.
 

 ¶ 1. This appeal arises out of contracts between Kenneth R. Daughtrey, Paul Upton, Charles Thomas Carden, and William Allred. In 1992, Allred approached Daughtrey and Upton with an opportunity to purchase mineral rights from Amoco Corporation. Thereafter, Upton and Daughtrey each purchased mineral rights and promised to convey, as a commission, fifteen percent of those rights to Carden, after their expenses for the purchase of the mineral rights had been recouped. Carden subsequently passed away, and Allred was assigned Carden’s rights to the fifteen-percent interests. In 2003, Allred filed suit in the Jones County Chancery Court against Daughtrey and Upton, seeking conveyance of the fifteen-percent interests as well as damages for lost profits. The chancery court found in favor of All-red, and ordered Daughtrey and Upton to convey their interests and pay Mired $26,807, each, as damages. Feeling aggrieved by the chancery court’s judgment, Daughtrey and Upton appeal, asserting that Allred lacked standing to file his complaint, that the court erred in finding the contract enforceable, and that the court erred in finding that a ten-year statute of limitations applied to Allred’s claim, rather than a three-year statute of limitations.
 

 ¶ 2. Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 3. In 1992, Carden learned of an opportunity to purchase from Amoco around fifty-three thousand acres of mineral rights, spread over numerous Mississippi counties. Carden and Allred had been close friends and business associates for a number of years, and Carden brought All-red into the Amoco deal. Allred in turn brought in Daughtrey, Upton, and two other investors, each of whom agreed to convey fifteen percent of their mineral rights to Carden as a commission for the Amoco deal. In total, thirteen investors purchased various percentages of the Amoco mineral rights. Allred purchased 5.68% of the mineral rights for almost seventy-five thousand dollars, and Daughtrey and Upton each received a 1.89% ownership interest in the mineral rights for about twenty-five thousand dollars each. Testimony indicated that there were transactional costs and expenses of approximately fifty thousand dollars, of which Daughtrey and Upton each paid around a thousand dollars as their pro rata share. Shortly after the purchase of the mineral rights, Daughtrey, Upton, and the two other investors recruited by Allred each signed an agreement to convey fifteen percent of their mineral
 
 *1256
 
 rights to Carden as promised prior to being allowed to purchase a percentage of the Amoco mineral rights. The fifteen percent was to be paid “at such time as [the] investment had paid out.”
 
 [1]
 
 The agreement also stated that each investor “agrees to notify C.T. Carden at such time as payout occurs and within thirty (30) days of payout[,] assign in writing by recordable Assignment 15% of the interest acquired by [the investor].... ” Testimony at trial indicated that Daughtrey and Upton expressed qualms about the commission before finally signing the contracts.
 

 ¶ 4. Carden passed away on September 12, 1995. On May 15, 1998, Jay Cuccia, Carden’s stepson, was appointed and confirmed as administrator of Carden’s estate. Carden’s rights to the fifteen-percent interests were assigned to Allred by Cuccia on February 28, 2000. The assignment stated that “although the agreements were executed in favor of Carden, same was done for the purpose of convenience only and were held in the name of Carden on behalf of William Wallace Allred.” In September 1999, Daughtrey and Upton received the payout of their investment in the mineral rights. Despite having contracted to do so, neither made any effort to inform anyone that their investment had paid out.
 

 ¶ 5. On February 27, 2003, Allred filed a complaint in the chancery court against Upton and Daughtrey, asserting that they had breached contracts requiring them to transfer fifteen percent of their mineral rights to Carden, and, subsequently, to Allred due to the assignment of that right to Allred. The complaint also sought reimbursement for the profits on the fifteen-percent interests that Upton and Allred had each been receiving.
 

 ¶ 6. Upton’s answer to Allred’s complaint was filed on April 8, 2003, while Daughtrey filed his answer on April 10, 2003. In them answers, Upton and Daughtrey asserted three affirmative defenses: (1) that the statute of limitations had run, (2) that Allred and Upton had an attorney-client relationship that should have prevented Allred from filing the action, and (3) that Allred’s dealings with them, combined with the lack of a disclosure agreement, prohibited Allred’s action because he was “in violation of the Standards of the Code of Ethics of Attorneys practicing in the State of Mississippi.” Both answers also stated that Upton and Daughtrey had assigned their fifteen-percent interests to Carden only after being assured by Allred that he had also assigned a portion of his interest to Carden.
 

 ¶ 7. On May 2, 2003, Upton and Daugh-trey filed separate motions requesting that their cases be consolidated. The record reflects that little was done in the case from mid-2003 until early 2005, when All-red filed a motion requesting a trial setting and consolidation of Upton’s and Daugh-trey’s cases. On June 6, 2005, the chancery court consolidated the two cases and set trial for November 9, 2005. Trial was delayed for a variety of reasons, including Hurricane Katrina. In August 2006, the chancery court entered an order bifurcating the trial “as to liability and damages.” Trial was ultimately held in September 2006.
 

 ¶ 8. Cuccia was the first witness to testify at trial. He testified that he had worked with Carden in the oil and gas industry for many years. He explained that Carden and Allred had been close friends who also conducted business to
 
 *1257
 
 gether; he indicated that his stepfather and Allred “probably talked close to daily.Cuccia indicated that Carden and Allred trusted each other enough that many of their business deals were conducted verbally: “We were not worried about it if we sent a check to Wallace Allred for fifty thousand dollars, you know. It wasn’t like I had to follow up and say, oh, where is this deed, you know. Like, you know, you knew it was coming.”
 

 ¶ 9. Allred testified next. Like Cuccia, Allred testified about his close friendship with Carden. Allred explained that he had attempted to teach Daughtrey about the oil and gas business after Daughtrey approached him wanting to enter the market. Allred testified that he brought Upton into the Amoco deal because he and Upton had been very good friends for many years. Allred explained that, in the oil and gas business, it was not unusual to “pay for 100 percent and get 75 percent,” to, in other words, forfeit twenty-five percent of the mineral rights as a commission. All-red testified that, because he was friends with Upton, Daughtrey, and the other investors, he and Carden decided to charge only fifteen percent as a commission, and to make the commission payable only once the investors had recouped their initial outlay. The court asked Allred what “payout” meant in the oil and gas industry, and Allred explained: “In the industry, payout is that time and point at which the investor has received in income or sufficient income to cover his cost of drilling.... [I]t’s that point in time at which the participant has received sufficient income to cover the cost of buying it and managing it....” Allred admitted that he should have informed Upton, Daughtrey, and the other investors after he and Carden decided that Allred would receive the fifteen-percent interests rather than Carden. However, Allred indicated that Carden did not initially decide that Allred would receive the interests. Allred testified that, when Daughtrey informed him that he would not convey his fifteen-percent interest as he had promised, Daughtrey told him that his reasons for refusal were that he was upset that he had lost so much money in the oil industry and that he believed that Allred thought that he had no class.
 

 ¶ 10. Allred admitted that only Daugh-trey, Upton, and the two other investors who Allred brought into the Amoco deal paid the fifteen percent as a commission. Allred testified that this was because the other investors all had years of experience in the oil and gas business; as such, they had provided deals and opportunities for each other many times and knew what they were doing. Allred testified that the four investors that he brought into the deal, by contrast, knew nothing about the oil and gas business and would, therefore, need a lot of help to successfully utilize their mineral rights. Allred indicated that that was why only those four investors were asked to pay fifteen percent of their interest as a commission.
 

 ¶ 11. As Daughtrey and Upton’s attorney concluded his cross-examination of All-red, he asked a series of questions intimating that Allred had acted as Daughtre/s or Upton’s attorney in the Amoco deal. After Allred’s cross-examination, the chancellor inquired of Upton and Daughtrey’s attorney whether he had “any document that establishes [an] attorney-client relationship.” The attorney responded that he did not. He further admitted to the court that there are no checks showing payments for legal fees to Allred.
 

 ¶ 12. Wallace Stewart Leggett, one of the four investors brought into the deal with Upton and Daughtrey, then testified on behalf of Allred. Leggett was a business partner with Bobby Joe Dykes, another of the four investors that Allred
 
 *1258
 
 brought into the Amoco deal. Leggett testified that he purchased fifty thousand dollars’ worth of mineral rights in the Amoco spread, and that he understood that he would be required to convey fifteen percent of his interest therein once he had recouped all of his expenses. Leggett indicated that all of the investors that Allred brought into the Amoco deal had been told about the fifteen-percent commission before they purchased any of the mineral rights. Unlike Daughtrey or Upton, Leg-gett gave notice once he received his payout. Leggett testified that he conveyed fifteen percent of his interest to Allred in June 2000, after confirming that the fifteen-percent interests had been transferred to Allred by Carden’s estate. Leg-gett also indicated that he was never led to believe that everyone involved in the Amoco deal would convey a fifteen-percent interest. Finally, Leggett testified that he had never considered Allred to be working as his attorney on the Amoco deal, and that, to his knowledge, Upton and Daugh-trey had never indicated that Allred was acting as their attorney in the matter.
 

 ¶ 13. After the testimonies of a few more witnesses, Allred rested. Neither Upton nor Daughtrey made a motion for a directed verdict at the close of Allred’s case. Upton testified after Allred rested. Upton confirmed prior testimony to the effect that he and Allred had been very close friends for a long time. Upton also described the initial meetings regarding the Amoco deal. Upton testified that, regarding the first meeting, “I don’t ever recall him mentioning anything about a backup 15 percent or any other thing.” Upton stated that the first time he heard about the fifteen-percent commission to Carden was when Allred presented him with the agreement for Upton to sign. Upton claimed that Allred had come to his home one morning after Upton’s initial refusal to sign the agreement, and that the following conversation ensued:
 

 In my den, he told me that everybody had signed the agreement over to Mr. Carden. And I says, What do you mean, all the investors has signed [sic] it? He said, That’s right. I said, Wallace, did you sign one over to him? Yes. Told me yes. The [sic] he told me — and I still told him I didn’t want to sign it. And — because I just didn’t believe I owed anymore money to nobody. And he told me, Well, Mr. Carden will sue you for it if you don’t sign it. He’ll get his money one way or the other. That’s the words he told me. And he says, [y]ou’re the last one, Paul. Everybody else has signed it. And he told me he’d signed it.
 

 Upton testified that he signed the agreement after this meeting in his home. However, he further testified that he was still unconvinced that he should have signed the agreement. In the days following his signing, sometime in 1992, he spoke with two Amoco investors, neither of whom were brought in by Allred. He learned that neither of them was assigning a fifteen-percent interest to Carden as a commission. Upton testified that he then had a confrontation with Allred, wherein he accused Aired of swindling him.
 

 ¶ 14. Upton also testified about a meeting with Aired several years later, after Carden’s death, wherein Aired attempted to get Upton to convey the fifteen-percent interest in accordance with the agreement that he had signed. Upton testified that he refused to convey fifteen percent of his interest to Aired. When asked by his attorney whether he had signed the agreement to convey the fifteen-percent interest to Carden, Upton replied that he had done so “[u]nder duress.” Upton indicated that he received his payout from the Amoco minerals on September 29, 1999. Upton
 
 *1259
 
 testified that he would have conveyed the fifteen-percent interest to Carden if Car-den had still been alive. Essentially, Upton testified that it was Allred’s reception of the interest that Upton refused to acquiesce to.
 

 ¶ 15. The chancellor questioned Upton’s actions after Upton came to believe that he had been defrauded by Allred, as follows:
 

 [THE COURT]: Well, that’s why I asked you if you thought this was a fraud from 1992 forward, why in the world didn’t you do something about it — report it to the law, call the Oil and Gas Board, call the District Attorney, call the county attorney, call the Attorney General’s office, file a lawsuit to have it all set aside or at least your agreement set aside because it was fraudulent?
 

 [UPTON]: I can’t answer that question for you, Judge, because I
 
 don’t know why.
 
 I was just so upset with [All-red]. And I knew, because he kept threatening me with a lawsuit. Now, I guess I ought to have sued him.
 

 (Emphasis added).
 

 ¶ 16. Daughtrey testified after Upton. Daughtrey testified that, like Upton, he had misgivings about the agreement to convey a fifteen-percent interest to Carden but that he signed the agreement after Allred told him that Carden would sue Daughtrey if he did not sign the agreement. Daughtrey testified that his Amoco investment paid out on September 23, 1999. Daughtrey further testified that he refused to convey fifteen percent of his mineral rights to Allred because Daugh-trey had signed an agreement to convey the interest to Carden, not Allred. Daughtrey testified that he did not think the assignment of the fifteen-percent interest to Allred was valid, because:
 

 I — I don’t think it is. I don’t think it’s a legitimate assignment, because Mr. Cuccia — Cuccia signed this over for the estate of Mr. Carden, C.T. Carden, as the administrator and I don’t — I know I’m not — I don’t know anything about the legal ends of that. But I wouldn’t think that it was on the up and up, sir.
 

 Daughtrey also had the following exchange with his attorney during direct examination:
 

 Q. At the time you signed that agreement, if it had been signed over to Mr. Allred, would you have signed it?
 

 A. No, sir. Because I wouldn’t have.
 

 Q.- If Mr. Carden had presented the mineral deed to you after payout was assigned, would you have done that?
 

 A. I certainly would have, because I had an agreement with him. I had an agreement with him to do just that and I would have done that.
 

 [THE COURT]: Let me ask you this question.
 

 A. Yes, sir.
 

 [THE COURT]: Same one I asked Mr. Upton over there. If Wallace Allred, tomorrow said, well, you know, I’m tired of fooling with this. I’m just gonna reassign this back over to the Estate of C.T. Carden and they’ll own it, whoever his heirs are. Would you sign it then?
 

 A. To the Estate of Mr. C.T. Carden?
 

 [THE COURT]: Uh-huh.
 

 A. I would have to, sir. Because I had signed that agreement to Mr. C.T. Carden and he was deceased and then his succession was in the process [sic].
 

 ¶ 17. After stating that he assumed that Allred was his attorney, Daughtrey was asked by the court what fees he had paid Allred for legal representation. Daugh-trey admitted that he had not paid Allred for any legal fees and that Allred had never billed him for any legal services.
 
 *1260
 
 Daughtrey further admitted that Allred had never told him that he was acting as his attorney.
 

 ¶ 18. After Daughtrey’s testimony concluded, Daughtrey and Upton rested their case. The chancellor then related his findings, which stated, in pertinent part, as follows:
 

 Based on the testimony that the Court has heard, the Court finds that, when these two defendants along with the other two investors from Covington County met with Mr. Allred, that they were in fact informed about a commission involving Mr. C.T. Carden. They knew it going in, knew it on the front end. I’ve had one of the original investors to so testify that he was at a meeting where all of them were in attendance when this was discussed, and I find his testimony to be credible. In fact, he has honored his agreement that he signed.
 

 Mr. Daughtrey and Mr. Upton readily admit they signed the agreement for the 15[-]percent back-end commission. They both readily admit that, if C.T. Carden had called upon them during his lifetime to execute the conveyance, that they would have done so. They would have been legally obligated and bound to do so; even suggest that, if the C.T. Carden Estate[J which now exists[,] called upon them to do so, that they would be bound to do so.
 

 Mr. Allred’s interest comes to him through C.T. Carden[,] assigned by the C.T. Carden Estate to him. He is the rightful owner of whatever rights that C.T. Carden had against Daughtrey and Upton. And, of course, this is subject to the executor sending the Court, certified under the Acts of Congress, whatever court order is necessary to formerly [sic] approve the conveyance or assignment to Mr. Allred.
 

 What it seems to me like is, is that the defendants don’t have a problem paying anybody other than Allred. And why? I don’t know. Seems to me that folks that have had and maintained the kind of friendships these people have had over the years, it looks to me like one friend ought to feel good about another friend making money; and that, if somebody is gonna make a commission, I would rather have a friend of mine make a commission than I had somebody I had never seen and laid eyes on. But sometimes human nature prevails and folks get all bent out of shape when they think somebody’s gonna make some money that they’re not gonna make. And that seems to be the basis for what happened here.
 

 Additionally, Mr. Upton testified that in 1992, he knew about all this [sic] shenanigans as he inferred that they were. I’m sure he discussed it with Mr. Daughtrey. From 1992 until this lawsuit was filed, they did absolutely nothing to attempt to challenge this agreement that they both agreed that they had signed in favor of C.T. Carden. Mr. Upton complains that, because of all [sic] the investors didn’t sign it, then that’s — -he shouldn’t have to sign it. But, nevertheless, he did sign it and did nothing whatsoever to challenge it, even though he believed that Mr. Allred had lied to him about all the other investors signing it and about Mr. Allred having signed it.
 

 Frankly, I find Mr. Allred’s testimony to be credible in that regard. I don’t believe that he misrepresented anything to Mr. Upton in that regard. He may have said all other investors have signed it. And I think by that, who he was talking about were the four guys in Covington County, Mississippi, that he was meeting with on a regular basis as being all of the investors that he was referring to, if in fact it was even questioned.
 
 *1261
 
 So, this agreement — these agreements signed by these gentlemen are enforceable.
 

 The chancellor then went on to discuss the statute of limitations. He asked the parties to provide briefs supporting their arguments regarding the statute of limitations and whether it had run. Thereafter, on March 13, 2007, the chancery court entered a judgment as to liability. In pertinent part, the court found the following:
 

 By separate written agreements executed by Paul Upton and K.R. Daughtrey!,] each is obligated to convey to William Wallace Allred, assignee of the succession of C.T. Carden, deceased, 15% of the interest each originally acquired in certain mineral interests formerly owned by Amoco Production Company ... consisting of approximately 53,000 mineral acres over various counties in Mississippi.
 

 “Payout” as defined in the Agreement of Paul Upton ... occurred on September 29, 1999.... “Payout” as defined in the Agreement executed by K.R. Daughtrey ... occurred on September 23, 1999.... Within thirty days of payout, each Defendant was obligated to assign in writing by recordable instrument 15% of the interest he originally acquired in the Amoco Minerals. Neither defendant at any time gave notification of payout nor executed a written Assignment in favor of C.T. Carden, his successors or assigns, of 15% of the interest originally acquired in the Amoco minerals.
 

 C.T. Carden died in September, 1995.... By instrument dated February 28, 2000[,] ... the [administrator] assigned to [Allred] all right, title, and interest in and to the Agreements signed by Paul Upton and K.R. Daugh-trey. ... The Agreements executed by the Defendants ... are supported by consideration, are valid and enforceable, and were not procured by fraud or misrepresentation as alleged by the Defendants.
 

 No attorney-client relationship between the Plaintiff and either Defendant ever existed concerning or relating to the Amoco Minerals. The Assignment by the succession representative of C.T. Carden ... in favor of the Plaintiff, is supported by consideration, is otherwise valid and enforceable, and has been approved and ratified by the District Court of the 22nd Judicial District of St. Tammany Parish, Louisiana, in the Matter of the Succession of Charles Thomas Car-den, No. 95-30506.
 

 [Allred] filed each of the above captioned actions on February 27, 2003. The three[-]year “catch-all” statute of limitations in Mississippi] Code Annotated section] 15-1-49 applies to the Plaintiffs claim for recovery of a percentage of income and proceeds from production paid to the Defendants. A ten[-]year statute of limitations provided in Mississippi] Code Annotated section] 15-1-7 and [section] 15-1-9 applies to the Plaintiffs claims for recovery of a percentage of the Defendants’ interests originally acquired in the Amoco Minerals. The Defendants should each provide an accounting for all income and production proceeds attributable to their respective interests in the Amoco Minerals from and after September 30, 1999[,] to date.
 

 Judgment should be granted in favor of [Allred] on his complaints against [Upton and Daughtrey] in the above captioned actions, but only insofar as set forth herein. [Allred’s] claims for defamation and for tortuous interference should be dismissed. The affirmative defenses and all relief requested by [Upton and Daughtrey] against [Allred]
 
 *1262
 
 should be denied and their counterclaims dismissed.
 

 The judgment finally ordered Daughtrey and Upton to each convey fifteen percent of their mineral rights to Allred and to pay Allred “an amount equal to income attributable to 15% of [the] 1.89% undivided interest in the Amoco Minerals paid or received from and after February 27, 2000[,] with interest at the rate of 8% per year.” The order further stated that a hearing would be held on the issue of damages once Daughtrey and Upton filed accountings with the chancery court.
 

 ¶ 19. On January 30, 2007, the Twenty-Second Judicial District Court of Saint Tammany Parish, Louisiana, entered a judgment granting Cuccia the authority to assign Carden’s rights to the fifteen-percent interests to Allred. The judgment stated, in pertinent part, as follows:
 

 Considering the Petition for Authority to Execute Assignment and Conveyance of Mineral Leases of William Wallace Allred filed herein on January 8, 2007, by L. Jay Cuccia ... and that this Court deems it to be in the best interest of this Succession to authorize the Administrator to enter into the Assignment and Conveyance of certain interests in oil, gas and mineral leases located in the State of Mississippi ... and evidence having been submitted that Notice of the filing of the Petition was given according to law by publication in the Times-Picayune, that more than seven (7) days have expired since the date of publication of said Notice, and that no Opposition thereto has been filed;
 

 IT IS ORDERED, ADJUDGED AND DECREED that Covington County, Mississippi residents Paul Upton, Bobby Jo Dykes, K.R. Daughtrey, and W. Stuart Leggett executed agreements in favor of the decedent C.T. Carden in September and October 1992 to convey after “payout” 15% of the interest each investor originally acquired in certain mineral properties in Mississippi.... For good and valuable consideration including the work of William Wallace All-red in the evaluation, acquisition and management of the Amoco Minerals, C.T. Carden during his lifetime agreed to assign to William Wallace Allred Car-den’s interest in those agreements described above. After the death of C.T. Carden, and on February 28, 2000, L.J. Cuccia, Administrator of the Succession of C.T. Carden, deceased, assigned to William Wallace Allred all right and title and interest of C.T. Carden, or his Succession, in and to the agreements....
 

 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that ... Cuccia ... is hereby authorized, directed and empowered to enter into the Assignment and Conveyance of Mineral Leases to William Wallace Allred dated February 28, 2000, a true copy of which is attached to the Petition filed in this matter....
 

 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Assignment is supported by consideration and is otherwise valid and the act of ... Cuccia ... in executing said Assignment is hereby ratified, approved, and allowed by the Court;
 

 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that L. Jay Cuccia, Administrator, is hereby authorized, directed and empowered to execute, on behalf of this Succession, whatever other documents and take whatever other actions are necessary in order to effect the Assignment to William Wallace Allred of all right, title and interests under and through the Agreements described in the Assignment attached to the Petition....
 

 
 *1263
 
 ¶ 20. On April 11, 2007, before submitting any accountings, Daughtrey and Upton filed a notice of appeal to the Mississippi Supreme Court from the March 13, 2007, judgment. On June 7, 2007, the Mississippi Supreme Court dismissed Upton’s and Daughtrey’s appeal, finding that “the judgment from which the notice of appeal was filed is not a final, appealable judgment....” On August 6, 2007, Daugh-trey and Upton filed an accounting with the chancery court. In it, Daughtrey and Upton stated that: “based upon the language of the Court’s ruling[,] the Defendants have done their best to calculate income and interest, however, the directive as to [ajccounting had a beginning date of September 30, 1999[,] while the directive as to the money judgment had a beginning date of February 27, 2000.” The parties further stated that: “[Bjoth ... [account-ings include calculations for said management costs and reduction of [Allred’s] judgment based upon said management costs. Though the Defendants did not in fact pay management costs, they nonetheless performed the very work which such a management entity would have performed.” The accountings also raised the issue of the validity of the assignment of the fifteen-percent interests to Allred:
 

 Defendants assert that nothing in the record, not the Judgment on Petition for Authority to Execute Assignment ... nor any other document presented at trial nor the sworn testimony of any witness, breathed life into the original assignment dated February 28, 2000. The Assignment signed on that date was void as a matter of law. The Administrator of the Succession of C[.]T[.] Car-den was without authority to sign said document. Further, the
 
 Judgment ...
 
 entered on February 1, 2007, by the 22nd Judicial District Court, Parish of S[t]. Tammany, Louisiana,
 
 did not
 
 authorize the Assignment to be back dated to February 28, 2000.... Likewise, said
 
 Judgment
 
 is devoid of any mention of it being a
 
 nunc pro tunc
 
 order. As such, the S[t], Tammany Court merely gave the Administrator the authority to sign the Assignment as it read on February 28, 2000,
 
 but
 
 effective as of the date of said Judgment, that being February 1, 2007. As the Assignment cannot become effective until February 1, 2007, the Defendants have included calculations in their [accountings to reflect the same.
 

 Essentially, the accountings provided multiple calculation for what was owed to All-red, depending on what amounts were discounted as expenses and what time period was used. With no deductions, the ac-countings provided a total of over twenty thousand dollars. Other calculations by Upton and Daughtrey figured that Allred was entitled to less than a thousand dollars for the profits that Upton and Daughtrey had improperly received.
 

 ¶ 21. On April 4, 2008, Upton and Daughtrey filed a motion to dismiss based on the premise that the federal Securities Acts
 
 [2]
 
 prohibited Daughtrey’s and Upton’s ability to sell the fifteen-percent interests in their mineral rights. Allred filed an answer to the motion on April 8, 2008, denying that he had sold any interest to Daughtrey or Upton, denying that the transactions involved interstate commerce, denying that the Securities Acts would apply to the transactions, and arguing that Upton and Daughtrey waived any argument regarding the Securities Acts when they failed to raise the Acts as an affirma
 
 *1264
 
 tive defense in any pleadings or otherwise raise the issue of the Acts during litigation.
 

 ¶ 22. On April 15, 2008, the chancery court issued two judgments, one against Upton and one against Daughtrey, in which it found, in pertinent part, as follows: “that the Plaintiff WILLIAM WALLACE ALLRED shall have and recover from the Defendant ... the sum of $26,807 together with interest at the rate of 8% per annum until paid.” The judgments also ordered Upton and Daughtrey to pay for the “costs of this action,” with each responsible for one-half of the costs.
 

 ¶ 23. On April 18, 2008, Daughtrey and Upton filed a motion for a new trial, alleging that the judgment is against the overwhelming weight of the evidence, that Allred fraudulently obtained the fifteen-percent interests in the mineral rights, that the statute of limitations barred All-red’s recovery, that the chancellor erred in finding that Allred was assigned the right to the fifteen-percent interests on February 28, 2000, rather than February 1, 2007, and that the transfer was prohibited by federal securities laws. The court summarily overruled the motion on May 5, 2008.
 

 ¶ 24. Daughtrey and Upton filed a notice of appeal on May 7, 2008, leading to their appeal before this Court. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Standing to File Complaint
 

 ¶ 25. Upton and Daughtrey first claim that Allred had no standing to file a complaint because the transfer from Carden’s estate to Allred was invalid, and because the federal Securities Acts voided the mineral rights contracts. As we will discuss in the next issue, we find that the Securities Acts do not void the contracts.
 

 ¶ 26. The issue of the validity of the assignment of the fifteen percent to Allred was raised at trial during Cuccia’s cross-examination. However, the issue was never raised in any of the pleadings filed by Upton or Daughtrey. Furthermore, even though this issue was raised during trial, it was immediately objected to by Allred’s attorney on the ground that the issue had not been raised in any pleading. “[A] defendant’s failure to timely and reasonably raise and pursue the enforcement of any affirmative defense or other affirmative matter or right which would serve to terminate or stay the litigation, coupled with active participation in the litigation process, will ordinarily serve as a waiver.”
 
 Fletcher v. Limeco Corp.,
 
 996 So.2d 773, 780(¶ 20) (Miss.2008).
 
 See also
 
 M.R.C.P. 8(c); M.R.C.P. 12(b). Therefore, we find that this issue is procedurally barred due to Daughtrey’s and Upton’s failure to raise the issue as an affirmative defense.
 

 ¶27. Even were this issue not procedurally barred, we would find that it lacks merit. The judgment of the Louisiana district court validated Cuccia’s decision, as administrator, to transfer the fifteen-percent interests to Allred. The district court did so with the full knowledge that Cuccia had executed the transfer several years before, and nothing in the district court’s judgment indicated an intent to limit the conveyance to the date of the district court’s judgment. Per Article IV, Section 1, of the United States Constitution, we must give the Louisiana district court’s judgment full faith and credit.
 

 ¶ 28. This contention of error is without merit.
 

 
 *1265
 

 2. The Securities Acts
 

 ¶29. Daughtrey and Upton also contend that the transfer of mineral rights from Allred to them is void because Allred was not a registered broker under the federal Securities Acts. This argument misses the mark, as Allred did not convey any mineral rights to Daughtrey and Upton. Rather, Daughtrey and Upton purchased the mineral rights from Amoco. Allred contends that this issue is also procedurally barred due to Daughtrey’s and Upton’s failure to timely raise the issue. We find that we must first examine whether the Securities Acts would void the conveyance of the fifteen-percent interests to Allred from Daughtrey and Upton.
 

 ¶ 30. While Section 77e of Title 15 of the United States Code (2006), which is part of the Securities Act of 1933, prohibits the sale of an unregistered security through interstate commerce, no provision of the Securities Acts indicates that a transaction so consummated is thereafter void, as Daughtrey and Upton urge us to find.
 
 See
 
 15 U.S.C. §§ 77a-77z (2006); 15 U.S.C. §§ 78a-78ff (2006). Furthermore, a careful scrutiny of the relevant case law has failed to reveal any situation where such a transaction has been deemed void as a matter of law. Therefore, the federal Securities Acts do not require a finding that any of the transactions here are void.
 

 ¶ 31. Neither Daughtrey nor Upton raised the issue of the Securities Acts until after the court had ruled against them as to liability. Rule 8(c) of the Mississippi Rules of Civil Procedure explicitly states that illegality and fraud are affirmative defenses that must be timely raised in pleadings. When Daughtrey and Upton’s attorney requested that the record be reopened so that the Securities Acts claim could be litigated, the chancellor refused but allowed the attorney to make a proffer regarding the claim. We find that the chancellor was correct in finding that Daughtrey and Upton had waived any claim of illegality as a result of the federal Securities Acts. As already discussed, nothing in the Securities Acts operates to void the transactions as a matter of law.
 

 ¶ 32. This issue is without merit.
 

 S. Statute of Limitations
 

 ¶ 33. In their final issue, Upton and Daughtrey contend that the chancery court erred in finding that a ten-year statute of limitations applies to the conveyance of the fifteen-percent interests to Allred. Neither Upton nor Daughtrey protest the chancery court’s application of a three-year statute of limitations to the profits from the fifteen-percent interests.
 

 ¶ 34. Upton and Daughtrey do not disagree that a ten-year statute of limitations applies to suits involving recovery of land, including mineral rights; rather, Upton and Daughtrey contend that the present case involves only a claim for breach of contract, which they submit would be subject to a three-year statute of limitations. Specifically, Upton and Daughtrey contend:
 

 The trial court commits error in its application of the law ... where the trial court loses focus of the allegations and actual claims by Mr. Allred. In his [c]omplaint[,] Mr. Allred makes claims for (1) [bjreach of [cjontract, (2) [c]on-structive [tjrust, (3) [ujnjust [ejnrichment, (4) [d]efamation[,] and (5) [intentional [interference with [bjusiness. In the
 
 [judgment
 
 on liability[,] the trial court specifically dismisses (4) and (5). As to “unjust enrichment” and “constructive trust,” neither term is found in said
 
 [judgment.
 
 Likewise, there is no discussion of “unjust enrichment” nor [sic] “constructive trust” during the trial court’s bench ruling.... As such, the
 
 *1266
 
 trial court clearly finds for Mr. Allred based solely upon his claim of breach of contract.
 

 ¶ 35. We find our supreme court’s discussion in
 
 Allred v. Fairchild,
 
 785 So.2d 1064, 1070-71 (¶¶ 16-18) (Miss.2001), a case also involving Allred, helpful:
 

 In order to properly analyze a statute of limitations question, an understanding of the chronology of events and the limitations in question is necessary. Allred and [Wiley] Fairchild enter into the agreement in December 1973; the sale of the Windham properties is closed on February 1, 1974; and Allred files suit on December 19, 1990. In other words, a total of 17 years passed between the oral contract and the filing of suit. The applicable statutes of limitations which might control are Mississippi] Code Ann[otated] [sections] 15-1-7, 15-1-9, 15-1-29, 15-1-39, [and] 15-1-49 (1995). Section 15-1-7 requires suits involving recovery of land to be brought within 10 years of “right to make entry.” Section 15-1-9 is also a 10[-]year statute of limitations for actions “claiming land in equity.” Section 15-1-29 establishes a 3[-]year statute of limitations upon actions on unwritten accounts or contracts. Section 15-1-39 imposes a 10-year limit on actions seeking or concerning trusts, and [section] 15-1^49 is a catchall provision establishing a three-year deadline on all matters without specified limitations. Miss.Code Ann. §§ 15-1-7, 15 — 1— 9,15-1-29,15-1-39,15-1-49 (1995).
 

 Although 17 years is obviously not within any of these limits, Allred argues that the statute of limitations did not begin to run until he could enforce his rights.
 
 See Burwell v. Planters Lumber Co.,
 
 220 Miss. 79, 70 So.2d 71 (1954). Since there is undisputed testimony that payout occurred sometime in July 1981, All-red contends this date is the true time of accrual for statute of limitations concerns.
 
 See S[.] Wholesalers, Inc. v. Stennis Drug Co.,
 
 214 Miss. 461, 59 So.2d 78, 79 (1952). Therefore, the action would not be barred by [sections] 15-1-7, 15-1-9, and 15-1-39. Furthermore, Fairchild made numerous false representations and swore under oath to them, including: denying the existence of an oral contract, until presented with evidence of one; denying the existence of any documented proof of a contract when P-67 (a February 1974 memo) evidenced the existence of a contract; sworn testimony that payout records were never kept when, in fact, his longtime secretary testified that they were; and failure to turn over many highly relevant documents, even after compelled to do so. This litany of violations clearly justifies any delay in filing. As this Court has repeatedly held, fraudulent concealment of the truth tolls all statutes of limitations.
 
 Van Zandt v. Van Zandt,
 
 227 Miss. 528, 539, 86 So.2d 466, 470 (1956). There is also statutory authority for this position: “If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.” Miss.Code Ann. § 15-1-67 (1995). Under this rule, accrual did not begin until the late 1980s when Allred discovered that payout had already occurred. Thus, the suit was filed well within all of the applicable statutes of limitation[s].
 

 Allred testified that he asked about the payout status of the properties several times and was consistently lied to. Since accrual of his rights did not occur until 1981 and Fairchild fraudulently
 
 *1267
 
 concealed the truth, the statutes of limitations do not bar Allred’s various claims.
 

 This Court is now faced with the same statutes of limitations.
 

 ¶ 36. We find that the chancery court correctly ruled that a ten-year statute of limitations applies in this case. The ten-year statute of limitations found in Mississippi Code Annotated section 15-1-7 (Rev. 2003) applies to suits to recover mineral rights.
 
 See Fairchild,
 
 785 So.2d at 1070-71 (¶¶ 16-18);
 
 Covington v. Butler,
 
 242 So.2d 444, 448 (Miss.1970);
 
 Robinson v. Rhodes,
 
 236 So.2d 746, 749 (Miss.1970). Despite Daughtrey’s and Upton’s protests to the contrary, Allred’s suit was essentially a suit that set out to accomplish two objectives: (1) conveyance of the fifteen-percent interests in the mineral rights and (2) recovery of the profits that Daughtrey and Upton had been fraudulently receiving from the interests. The first of these is covered by section 15-1-7, the aforementioned ten-year statute of limitations; as to the second, the court applied a three-year statute of limitations, a decision that neither Daughtrey nor Upton has challenged. The
 
 Robinson
 
 court even noted that the ten-year statute of limitations would apply in a mineral rights
 
 contract
 
 case “[i]f the purpose of the ... suit were to determine the validity of the instruments [contracts] .... ”
 
 Robinson,
 
 236 So.2d at 749. Therefore, we find that the court properly determined that a ten-year statute of limitations applies to Allred’s claim for conveyance of the fifteen-percent interests.
 

 ¶ 37. Furthermore, Allred’s contention that an implied constructive trust exists in this case has merit, especially in the light of our supreme court’s holding in
 
 Fairchild.
 
 The
 
 Fairchild
 
 court stated, in pertinent part, that:
 

 Before we can determine whether the chancellor erred, we must first determine what is necessary to justify the imposition of a constructive trust.
 

 A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.
 

 Sojourner v. Sojourner,
 
 247 Miss. 342, 153 So.2d 803, 807 (1963) (citing 54 Am. Jur.,
 
 Trusts,
 
 § 218). Essentially, a constructive trust is an operation of equity. When one party holds title and benefits from land that he/she should not rightfully possess, a constructive trust is imposed for the benefit of another party who is rightfully entitled to a part or the whole. [M] at 808-[0]9 (citing
 
 Russell v. Douglas,
 
 243 Miss. 497, 138 So.2d 730 (1962)). The determination of the existence of a constructive trust is a matter of law and thus, subject to de novo review.
 
 McNeil v. Hester,
 
 753 So.2d 1057, 106[4 (¶ 26)] (Miss.2000). There is no question that Fairchild possesses the Windham properties. We need only determine whether Allred is due an interest in those properties.
 

 In his original motion as well as in appeal briefs, Allred cites to an extensive list of alleged discovery violations in support of his assertion that Fairchild committed fraud. Allred’s contention is that Fairchild purposefully lied, withheld evidence, and did everything possible to cover up the fact that he owed Allred a percentage of the Windham properties. This fraud has allowed Fairchild to benefit from the 10% interest due Allred per their oral agreement. As such,
 
 *1268
 
 Fairchild should not be allowed to benefit from his wrongdoing as a matter of law.
 

 In addition, the evidence indicates that Allred and Fairchild shared a special relationship based upon trust and mutual respect. “While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices.... ”
 
 Sojourner,
 
 153 So.2d at 807. In harmony with the equitable purpose of constructive trusts, we are careful not to apply too narrow a definition of confidential relationship. “An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one.”
 
 Id.
 
 at 808. All-red’s and Fairchild’s long and informal business relationship is a clear indication that a confidential relationship existed. After all, the two did business for over 20 years based on little more than a handshake. It was this confidential relationship that allowed Fairchild to conceal the truth concerning payout for so long.
 

 * * * *
 

 The present situation is tailor-made for the imposition of a constructive trust. Fairchild owns and profits off the Wind-ham properties because he fraudulently hid the date of payout from Allred[,] with whom he shared a confidential relationship. A constructive trust is a fitting remedy to right such unjust enrichment.
 
 Id.
 
 at 807. The chancellor erred in not imposing a constructive trust for Allred’s benefit. Therefore, we reverse the chancellor’s order and remand the case for determination of the value of the trust.
 

 Fairchild,
 
 785 So.2d at 1067-68 (¶¶ 7-11). The
 
 Fairchild
 
 court found that a constructive trust applied, even though the chancellor at trial had declined to impose a constructive trust. Therefore, we may impose a constructive trust, even in the absence of a finding by the chancellor to that effect.
 

 ¶ 38. Like the
 
 Fairchild
 
 court, we find that an implied constructive trust exists in this case. Daughtrey and Upton withheld the fifteen-percent interests in their mineral rights, even though they had signed contracts promising to do otherwise. Furthermore, they did not report their payout dates, even though they were required to do so by their contracts. Although Leg-gett and Dykes had reported their payouts, Allred could not conclusively assume from this that Daughtrey and Upton had received their payouts. As Allred testified, payout was achieved only after the investors received their initial outlay plus expenses from the mineral rights. Since All-red had no way to know what expenses Daughtrey and Upton had incurred, he could not affirmatively state when each received their payout. Since we find that a constructive trust should have been imposed, we find that a ten-year statute of limitations would also apply on that basis.
 

 ¶ 39. This issue is wholly without merit.
 

 ¶ 40. THE JUDGMENT OF THE CHANCERY COURT OF JONES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Payout was "deemed to [have] occur[ed] on the first day of the month following recoupment by Investor of all expenditures made in connection with the purchase, development and operation of the Amoco mineral interest.”
 

 [2]
 

 . We use “Securities Acts” to refer to the Securities Act of 1933 and the Securities Exchange Act of 1934.